UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

03 JUL 30 PM 3: 03

U.S. [ ........ ] COURT
N.D. OF ALABAMA

JOHN PORTERFIELD, )
)
    Plaintiff, )
)
vs. )    Civil Action No. CV-01-S-817-NE
)
THE BOARD OF TRUSTEES OF )
THE UNIVERSITY OF ALABAMA; )
CHARLES WOOD in his official and )
individual capacities; and JOHN )
DERALD MORGAN in his official )    **ENTERED**
and individual capacities, )    JUL 3 0 2003
)
    Defendants. )

## MEMORANDUM OPINION

Plaintiff, John Porterfield, alleges that his former employer, the University of Alabama

in Huntsville, subjected him to unlawful discrimination on the basis of his sex, and then

retaliated against him for complaining about such discrimination, and for filing a charge of

discrimination with the Equal Employment Opportunity Commission. These claims are

based upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

Plaintiff also asserts claims pursuant to 42 U.S.C. § 1983 against defendants Charles Wood

and John Derald Morgan, alleging that each of them violated his rights under the Equal

Protection Clause of the Fourteenth Amendment. The action presently is before the court on

defendants' motions for summary judgment, and to strike certain evidence submitted by

plaintiff in opposition to summary judgment.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not

only is proper, but that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

## I. FACTUAL BACKGROUND

Plaintiff began his employment with the University of Alabama in Huntsville ("UAH") during 1994, while still a design student, working in the publications office of the University Advancement Department.[1]  Upon plaintiff's graduation in the Spring of 1995, he was hired by UAH as a telephone fund-raiser, a position he occupied for two and one-half months.[2]  He then was offered a temporary position as Development Research and Systems Coordinator, effective September 12, 1995.[3]  In that position, plaintiff was responsible for operating and maintaining the database for the Advancement Division.[4]  The database, which

---

[1]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. A (deposition of John Porterfield), at 12.

[2]*Id.* at 17.

[3]Doc. no. 26 (Evidentiary Record in Support of Defendants' Motion for Summary Judgment), Hollins Affidavit ¶ 2; Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. A (deposition of John Porterfield), at 18.

[4]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. A (deposition of John Porterfield), at 21.

was known as "Millennium," contained biographical information relating to donors and prospective donors.[5]   From that database, plaintiff compiled various reports, such as comparisons of campaign solicitations and tables of alumni giving.[6]   Plaintiff also was responsible for assigning data entry projects.[7]   His title changed to Coordinator of Development Systems and Records, and his position became permanent, effective October 1, 1996. Plaintiff remained in that position until he resigned his employment during October of 2000.[8]

Plaintiff reported to Rinda Mueller, whose official title was Stewardship Coordinator, but who also performed the duties of the Director of Advancement Services, a position that was not occupied at the time.[9]   Mueller reported to the Director of University Development. Beginning in May of 1999, defendant Charles Wood was the Director of University Development.   Wood, in turn, reported to defendant John Derald Morgan, Ph. D., Vice President of University Advancement.[10]

Rinda Mueller resigned her position during late 1999 and, beginning in January of 2000, a search for candidates to fill the Director of Advancement Services position was initiated.[11]   The position description prepared at that time provided the following summary

---

[5]*Id.* at 22.

[6]*Id.* at 29.

[7]*Id.*

[8]Doc. no. 26 (Evidentiary Record in Support of Defendants' Motion for Summary Judgment), Hollins Affidavit ¶ 2.

[9]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. A (deposition of John Porterfield), at 36-37; *id.*, ex. J (deposition of Charles Wood), at 116.

[10]*Id.*, ex. D (deposition of John Derald Morgan), at 13.

[11]*Id.*, ex. C (deposition of Carolyn Horan), at 60.

of responsibilities:

> The Director of Advancement Services is responsible for the management of services related to private gifts to the University. These include gift accounting and database management of alumni and donor records, communications with donors on the use and benefits of gifts, administration of endowed funds, identification and research on potential donors, *and solicitation of gifts*. The Director serves as a senior member of the University Advancement staff assisting in the overall management of advancement fundraising.[12]

The required qualifications were: a bachelor's degree, with an advanced degree preferred; demonstrated management and administrative skills; demonstrated ability to motivate a team; and strong interpersonal skills. Experience in an academic environment also was desired.[13] The vacancy was posted within UAH, and was advertised in the *Huntsville Times* and on internet websites related to higher education.[14] Plaintiff did not apply for the position, because he "felt that the position of Director of Advancement Services is best suited to manage the day-to-day operations of the office and not to be a fund raiser."[15]

Carolyn Horan, UAH's Associate Director for Employment Compliance and Compensation, worked with Charles Wood to solicit and review applications for the position.[16] In that connection, Horan spoke with Wood about UAH's Affirmative Action Plan. According to Horan, she "reminded him [that UAH] did have a goal for females and

---

[12]*Id.*, ex. B (affidavit of John Porterfield), tab A (emphasis supplied).

[13]*Id.*

[14]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. C (deposition of Carolyn Horan), at 17; *id.*, ex. L, tab 54.

[15]*Id.*, ex. A (deposition of John Porterfield), at 69.

[16]*Id.*, ex. C (deposition of Carolyn Horan), at 17.

minorities in professional positions."[17]   Horan further stated that she told Wood, as she did

other supervisors, "even though we have a goal, we want to hire the most qualified person

regardless."[18]   Horan said that she added the clarification "because sometimes there are

misunderstandings about what a goal is.  People think a goal is a quota, and it's not."[19]

UAH's Policy Statement on Equal Employment/Affirmative Action reads as follows:

> The University of Alabama in Huntsville is committed to making
> employment opportunities available to qualified applicants and employees
> without regard to race, color, religion, sex, age, national origin, or handicap.
> All personnel actions and programs, including recruitment, selection,
> assignment, classification, promotion, demotion, transfer, layoff and recall,
> termination, determination of wages, conditions, and benefits of employment,
> etc. shall be administered in accordance with this equal opportunity policy.  It
> is the intent of the University that, in all aspects of employment, individuals
> shall be treated without discrimination on any of the foregoing bases and that
> employment decision shall instead be premised upon a person's ability,
> experience, and other job-related qualifications.

> Additionally, the University is an affirmative action employer of
> women, minorities, qualified handicapped persons, and covered veterans.  It
> is committed to making sustained, diligent efforts to identify and consider such
> individuals for employment and for opportunities arising during employment.

> These commitments are designed to meet nondiscrimination/affirmative
> action requirements imposed by the following federal and state sources of legal
> obligation, as amended:  Title VI and VII, Civil Rights Act of 1964; Executive
> Order 11246; Title IX, Education Amendments of 1972; the Rehabilitation Act
> of 1973; the Equal Pay Act of 1963; the Age Discrimination in Employment
> Act of 1967; the Vietnam Era Veterans' Readjustment Assistance Act of 1974;
> contract and grant agreements with governmental agencies; and the Alabama
> Constitution of 1901.  The University's employment and personnel policies
> include specific administrative procedures and implementing measures

---

[17] *Id.* at 18.

[18] *Id.* at 19.

[19] *Id.*

5

designed to carry out these pledges and to ensure compliance with the foregoing laws.[20]

More than thirty applications for the position were received. Wood convened a committee to assist in reviewing the applications and interviewing applicants; the committee included: himself; plaintiff; Cynthia Doubet, Director of Special Events; April Harris, Director of Alumni Relations; Pat Bradford, Manager of Gift Accounting; and Carol Raney, Senior Administrative Assistant.[21] Wood narrowed the pool of applicants to eighteen, and asked the committee members to review the applications and provide input.[22] Wood compiled the committee members' comments, and several individuals were selected to be interviewed.[23]

According to plaintiff, Wood announced during a Departmental staff meeting that an additional candidate would be interviewed:

> [Wood] told us that he was adding, at Human Resources' request, an African-American gentleman because the University — the University was an equal opportunity employer, or something like that. He stated that the division — that it was a courtesy interview or something along those lines, and that the University — no, take that back. *And that they wanted to hire a female for the job*, but they were going to give the gentleman the interview.
>
> Patricia Bradford stated to Mr. Wood that he couldn't say that, that it was discriminatory. Mr. Wood stated it was the truth.[24]

---

[20]*Id.*, ex. L, at tab 10.

[21]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. A (deposition of John Porterfield), at 67-68; *id.*, ex. J (deposition of Charles Wood), at 48.

[22]*Id.*, ex. J (deposition of Charles Wood), at 42.

[23]*Id.*

[24]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. A (deposition of John Porterfield), at 76 (emphasis supplied); *see also id.*, ex. G (deposition of Patricia Bradford), at 29-30.

Wood disputes that he made the foregoing comments.[25]

Following interviews, Marilyn Hargrave, a Caucasian female who held an administrative position in UAH's College of Nursing, was offered the position; however, she declined.[26] Wood and Morgan then authorized the Human Resources Department to offer the position to Waymon Ward, an African-American male. Following a reference check, Carolyn Horan advised Wood and Morgan that Ward was not an acceptable candidate.[27] Accordingly, an offer of employment was not extended.[28]

Rather than offering the position to any of the other candidates who had been interviewed, Wood announced during a Departmental staff meeting that the application period for the position would be reopened.[29] Plaintiff then decided to apply, because Wood informed the staff that the solicitation aspect of the position had been eliminated.[30] According to plaintiff, when he told Wood that he had applied for the position, the following exchange took place:

> The day that I applied for the job, I went to Charles [Wood] and informed him of my application. And he told me that he was taken aback by this, *that I knew they wanted a woman in that job.* I asked him for his support, and he told me he would give me a courtesy interview like all University

---

[25]*Id.*, ex. J (deposition of Charles Wood), at 34-35.

[26]*Id.* at 42-43. The record is not entirely clear whether Marilyn Hargrave was offered the position prior to consideration of Waymon Ward, or vice versa. *See, e.g., id.*, ex. C (deposition of Carolyn Horan), at 21 (Ward was first choice); ex. D (deposition of John Derald Morgan), at 37-38 (Ward was first choice); ex. J (deposition of Charles Wood), at 46 (Hargrave was first choice).

[27]*Id.*, ex. J (deposition of Charles Wood), at 45-46.

[28]*Id.* at 47.

[29]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. A (deposition of John Porterfield), at 74.

[30]*Id.* at 74.

employees . . . .[31]

Plaintiff was interviewed on April 3, 2000 by April Harris, Wood, and Morgan.[32]

When asked about the interview during deposition, Morgan described plaintiff's attire as

"worse than business casual."[33]  Wood recounted the interview as follows:

> A.    John was quite articulate and forceful for his vision of what he envisioned the office doing.  At the same time, I think there are two or three things that I recall:  Number one, in response to a question, he described himself as a team player, but he said that he wanted to be the one who made the final decision as the supervisor.  I'm thinking, well, some team players are more equal than others.
>
> Q.    He said that?
>
> A.    Yes, that he considered himself a team player, but that he preferred to be able to make the final decision as a supervisor.
>
> . . . .
>
> A.    Another one was, he said that he really enjoyed prospect research, and he said that he enjoyed finding out information about other people and described himself as quote nosy; and "nosy" was his word, not mine.
>
> He had an answer to one question that created some concern, and that was, Dr. Morgan asked him how he would go about responding to a particular request, and the request that Dr. Morgan presented was, what if, for whatever reason, the University decided to go ahead and build a football stadium, how would John, as Director of Advancement Services, go about helping support that kind of major fund-raising drive.
>
> And John's response was, well, he wouldn't support it because he didn't feel that UAH needed a football stadium.

---

[31]*Id.* at 77 (emphasis supplied).

[32]*Id.* at 79.

[33]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. D (deposition of John Derald Morgan), at 126.

8

And Dr. Morgan said, "Well, no, you don't understand. I'm just using that as an example of how would you go about a major project."

John said, well, if was an art center, which he felt the University needed, he would go about doing it in a certain way, and then he described that; but then he returned and said, but if it's a football stadium, he wouldn't support it because the University didn't need it.

And Dr. Morgan had told him earlier, "Well, we're talking about if it's a Presidential priority."

And after the meeting, we discussed that, and our sense was this simply confirmed what people's experience had been with John over the years; that is, John is very enthusiastic about doing projects that he feels are important, but when he receives projects that he feels are less than important or work that he doesn't enjoy doing, then he simply won't support it all the time.[34]

During deposition, plaintiff did not specifically recall the foregoing exchange.[35]

Subsequently, however, he submitted an affidavit stating:

When I interviewed for the position of Director of Advancement Services, I was dressed in business attire. I was wearing a suit, white dress shirt and tie with appropriate dress shoes. During the interview which was attended by Charles Wood, Derald Morgan and April Harris, I explained how I enjoyed doing research on perspective [sic] donors because I am naturally curious. April Harris then said "so you mean you are nosy." I took this in a joking manner. Additionally, when asked about fund raising for the building of a football stadium I stated that I did not have a problem with that. Mr. Wood then stated that we did not have a football team. I took his comment and compared the fact that UAH did not have a football team to the fact that UAH did not have a major in performing arts, but that we were currently doing a feasibility study on building a performing arts center. Dr. Morgan left the interview after only approximately ten minutes because he had to go to Butler High School for some sort of meeting.[36]

---

[34]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. J (deposition of Charles Wood), at 173-75.

[35]*Id.*, ex. A (deposition of John Porterfield), at 80-81.

[36]*Id.*, ex. B (affidavit of John Porterfield).

Wood and Morgan stated during deposition that, following plaintiff's interview, they, along with April Harris, discussed plaintiff's candidacy for the position. Morgan stated that he had been surprised that plaintiff had applied for the position, because plaintiff "clearly didn't have many of the qualifications."[37] Morgan further opined that plaintiff's response to his question about fund-raising for a football stadium illustrated his conclusion that plaintiff had been a "problem employee."[38] Specifically, Morgan observed that plaintiff failed to follow a directive to dispose of computers that had become obsolete, failed to implement a particular computer program, misled Morgan and Wood to believe that the database software was the most current version, and plaintiff and other employees ridiculed management during weekly luncheons.[39]

During deposition, Wood said that he, Morgan, and Harris were "disturbed by the interview."[40] Wood further stated that, "after the meeting, we discussed [the fund-raising question], and our sense was this simply confirmed what people's experience had been with [plaintiff] over the years."[41] Wood explained that plaintiff had experienced longstanding performance problems, such as failing to meet project deadlines,[42] improperly handling

---

[37]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. D (deposition of John Derald Morgan), at 49.

[38]*Id.* at 50.

[39]*Id.* at 51-53.

[40]*Id.*, ex. J (deposition of Charles Wood), at 172.

[41]*Id.* at 175.

[42]*Id.* at 126.

confidential data,[43] and disagreements with co-workers.[44] Also, Wood believed that plaintiff had not made sufficient efforts to minimize data errors and to maintain the integrity of the database.[45] Specifically, Wood pointed to one of plaintiff's assignments — the University President's holiday card list — which he alleged had been mishandled by plaintiff during the Fall of 1999.[46] Wood stated that many names appeared multiple times on the list, there were out-dated addresses, some names were missing, and listings had not been updated to reflect the names of current office-holders.[47] Wood acknowledged that gathering data for the list was not solely plaintiff's responsibility, but added that plaintiff was charged with "trying to minimize those errors as much as could reasonably be expected."[48]

Wood also described a meeting among the directors and the Vice President of the University Advancement Division during December of 1999, held at a public library in Madison, Alabama:

> [O]ne of the main topics on the agenda was to discuss what could we do about the database problems. I've been calling them "misuse," but we just called them "problems." At that discussion, following the discussions of all of the events, including [plaintiff's] history at the department and the interactions he's had with others over the years, the recommendation was, well, should we just go ahead and get rid of [plaintiff] and find someone else. There were absolutely no objections to that at all. I was the only one in that room after that

---

[43]*Id.* at 135.

[44]*Id.* at 138.

[45]*Id.* at 74-75.

[46]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. J (deposition of Charles Wood), at 73.

[47]*Id.* at 74-75.

[48]*Id.*

11

long silence that went to bat for [plaintiff].[49]

With regard to plaintiff's interaction with co-workers, Wood recounted an incident where Pat Bradford had become upset with plaintiff when he altered data relating to Gift Accounting, of which she was the manager, without notifying her. Upon discovering that the data had been changed, Bradford became upset and entered plaintiff's office. She placed her hands around plaintiff's throat in what Wood described as an attempt to strangle plaintiff.[50]

April Harris, who interviewed plaintiff with Wood and Morgan, characterized plaintiff as "personable and friendly" during the interview.[51] She further stated that she did not recall discussing the interview with Morgan and Wood after it was concluded.[52] Harris stated that she believed that plaintiff was not qualified for the position of Director of Advancement Services, because he had no supervisory experience, no fund-raising experience, and he had "a lack of what I would call professional demeanor; and a known contentious relationship with some of the people on our staff."[53] When asked about the directors' retreat held during December of 1999, Harris did not recall the group discussing plaintiff's job performance.[54]

Patricia Bingham, an African-American female, also was interviewed for the position

---

[49]*Id.* at 77-78.

[50]*Id.* at 87.

[51]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. J (deposition of April Harris), at 42. The deposition transcripts of both Charles Wood and April Harris appear in the exhibit designated as "J." Harris' deposition transcript directly follows Wood's.

[52]*Id.* at 44.

[53]*Id.* at 63.

[54]*Id.* at 56.

on April 3, 2000. She had been in the initial winnowed pool of eighteen applicants, but had not been selected for an interview at that time. Bingham's most significant employment was as a transportation manager for the Bi-State Development Agency located in St. Louis, Missouri, from 1979 until 1997. During her tenure at Bi-State, Bingham was employed in the Customer Service Department for nine years, and supervised more than thirty employees. Subsequently, she served as an operation supervisor for that company, and managed more than 2,000 employees.[55] Bingham described questions posed by Dr. Morgan during the interview as follows:

> Questions that I was asked in terms of job duties were how would I handle — well, he asked questions about my past job, which was at Bi-State, in terms of handling people, customer-service oriented questions. I think a question came up as to how did I deal with being black in an all-white situation, something on that order, but that was one of the questions. My answer to that was I had been the only one in a lot of different fields in my lifetime, so it's not a big deal. But it was those kinds of questions.
>
>       . . .
>
> Q.    Did Dr. Morgan explain the relevance of race to what your job duties might be there at UAH?
>
> A.    Not necessarily — no, he didn't.
>
> Q.    Can you remember any other questions by Dr. Morgan?
>
> A.    Other than race, it was about being a female in a male-dominated field; I think they dealt with that a little bit. They talked about that a little bit more because of the — the background of that particular transportation system doesn't have a lot of women in those particular positions, and he was aware of

---

[55]*Id.*, ex. E (deposition of Patricia Bingham), at 20.

that since he lived in St. Louis for a period of time.[56]

Shortly following the interview, Carolyn Horan offered Bingham the position.[57]  Bingham began employment with UAH as Director of Advancement Services on April 24, 2000.[58]  She supervised plaintiff and Patricia Bradford.[59]

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on May 18, 2000, alleging that:

> I was employed by [UAH] during August 1995. I held the title of Coordinator of Systems and Records at the time of the alleged violation.  On or about March 3, 2000, I applied for the position of Director of Advancement Services. I was interviewed for the position on April 4, 2000.  The above named employer failed to promote me on April 12, 2000.
>
> The Director of University Development, Charles Wood, informed me that he was seeking a female for the position of Director of Advancement Services because there were too many men in the department.
>
> I believe I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended, because of my gender, male.  I contend that I performed the duties of the position prior to and subsequent to the selection being made.  I contend that I was the most qualified applicant for the position of Director of Advancement Services.  I believe that the selectee failed to meet the minimum selection criteria.  The search committee recommended that the selectee not be hired.[60]

Wood and Morgan were informed by UAH's counsel of plaintiff's charge of discrimination,

---

[56]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. E (deposition of Patricia Bingham), at 19-21.

[57]*Id.* at 26.

[58]*Id.*, ex. L, at tab 43.

[59]Bingham's employment was terminated on September 26, 2001.  *Id.,* ex. E (deposition of Patricia Bingham), at 71.

[60]*Id.* at tab 32.

and assisted in preparing the response submitted to the EEOC on June 16, 2000.[61]

Plaintiff contends that Wood and Morgan retaliated against him for filing a charge of discrimination by assigning a heavy workload of menial tasks, and by insisting upon unrealistic deadlines by which projects were to be completed. Additionally, for a short time, he was required to work on Saturdays. Plaintiff also asserts that he was required to train Bingham to perform the duties of Director of Advancement Services, and that she told him she possessed the authority to fire him. Bingham also counseled plaintiff and Patricia Bradford about tardiness.

Plaintiff consulted with Gerry Moore, UAH's Vice President for Human Resources, shortly after he filed the EEOC charge.[62] He told her that he was experiencing problems with his supervisors, and that the problems were affecting his health.[63] Moore asked plaintiff whether he felt comfortable discussing the situation with his supervisors, but he was not receptive to the suggestion. She also suggested that he apply for other positions within UAH, but there were no openings at the time. Moore told plaintiff that his background in management information systems would be marketable outside UAH as well.[64] Moore stated during deposition that plaintiff did not tell her that he believed he was being retaliated against for filing an EEOC charge.[65]

---

[61]*Id.* at tab 33.

[62]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. K (deposition of Gerry Moore), at 62-66.

[63]*Id.* at 63.

[64]*Id.* at 64-65.

[65]*Id.* at 66.

Plaintiff left his position with UAH on October 13, 2000, indicating on a "Staff Employee Exit Report" that "conflict with supervisor" and "friction with co-workers" were the main reasons for his departure.[66]  He contends, however, that he was constructively discharged.

## II. MOTION TO STRIKE

Defendants have moved to strike certain evidence submitted by plaintiff in opposition to the motion for summary judgment.[67]  First, defendants seek to strike "all portions of plaintiff's evidentiary submission not referred to by either party in their respective briefs relating to the summary judgment motion" because such filing was in contravention of this court's instructions in its submission order.  Defendants, however, have failed to identify with specificity those exhibits, or portions of exhibits, that should be stricken.  Accordingly, this aspect of the motion is due to be denied.

Defendants also request that the court strike the following portions of the deposition testimony of Patricia Bradford appearing on page 39, at lines 4 through 17:

A.      Yes.

Q.      What did you talk to him about?

A.      Basically the fact that she treated you like a child instead of a professional adult.

Q.      Did he have any comment about this?

---

[66]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. A (deposition of John Porterfield), tab 3.

[67]Doc. no. 35.

> A.    No solution.
>
> Q.    Why did you leave UAH?
>
> A.    Partly due to health reasons.

The pertinence of the foregoing is unclear, to say the least; however, it is possible that defendants intended to address their motion to strike to the testimony appearing on page **40** of the deposition transcript, at lines 4 through 17: *i.e.,*

> Q.    Did anyone ever tell you that Patricia Bingham said her job was to get rid of John Porterfield and you?
>
> A.    Yes.
>
> Q.    Who told you that?
>
> A.    Patricia Bingham herself.
>
> Q.    Tell me the circumstances of that conversation.
>
> A.    The conversation happened, I believe, when I turned my resignation in to her.  She made the comment that she was worried about me because Derald Morgan had told her, "I want you to get rid of John Porterfield" and myself. John had left, and she was worried what was going to happen to me.[68]

Next, defendants seek to exclude the deposition testimony of Betty Mefford appearing on page 13, at lines 8 through 12:

> Q.    Did Mr. Wood say that just he wanted a woman for the job or did he also indicate that Dr. Morgan wanted a woman.
>
> A.    I thought he said that Dr. Morgan wanted a woman.[69]

---

[68]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. G (deposition of Patricia Bradford), at 40.

[69]*Id.*, ex. F (deposition of Betty Mefford), at 13.

Defendants also have moved to strike Ms. Mefford's testimony appearing on page 20, at lines

9 through 13:

> Q.    Have you ever heard Charles Wood make a statement to the effect that there were too many men in the Development department and that Dr. Morgan wants a woman in the position?
>
> A    Yes.[70]

Finally, defendants request that the court strike plaintiff's answer to interrogatory

number 8, parts 1 and 3:

> 8.    State the date, time, and place of each and every occasion on which Defendant Wood and/or Morgan informed Plaintiff that Wood and/or Morgan a) intended to hire a female for the Director of Advancement Services and/or b) that there were too many men in the department.  For each such occasion state the name, address, and telephone number of any other persons who witnessed each such statement.
>
> . . .
>
> 1) Date and time in original request for information from EEOC, Charles Wood announced in Development Staff meeting of his and Dr. Morgan's intention to hire a woman for the position.  Pat Bradford stated that they could not do that.  Charles Wood stated that it was what they were going to do.  (The announcement of the addition of a man to the original interview process prompted the original statement from Mr. Wood.)  Mr. Wood continued by saying that there were already too many men in the Development Office and that HR had asked him to add the gentleman to the interview list because of his race.  Present at those comments were:  Charles Wood, John Porterfield, Pat Bradford, Betty Mefford, and Dave Trueb.
>
> . . .
>
> 3) Date and Time unknown:  Derald Morgan told April Harris

---

[70]*Id.* at 20.

and Dave Trueb that certain Annual Fund projects would move forward
as soon as he found a woman for the Advancement Services position.[71]

As the following discussion will make clear, the court need not rely on the statements

that are the subject of defendants' motion to strike in order to rule on the motion for summary

judgment.  Accordingly, the motion will be denied as moot.

### III. DISCUSSION

**A.    Disparate Treatment Claim**

In order to prevail on a Title VII disparate treatment claim, plaintiff has the burden

of persuading a reasonable factfinder, by a preponderance of the admissible evidence, that

he suffered an adverse employment action, or was denied a benefit that affected his

compensation, terms, conditions, or privileges of employment in a material way, *see Davis

v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001), and that such action by the

employer was intentionally based upon a  prohibited characteristic, such as plaintiff's race

or sex.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824,

36 L. Ed. 2d 668 (1973); *Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir. 2001); *Wright

v. Southland Corp.*, 187 F.3d 1287, 1289-90 (11th Cir. 1999).

> Disparate treatment claims require proof of discriminatory intent either
> through direct or circumstantial evidence. *See [Harris v. Shelby County Board
> of Education,* 99 F.3d 1078, 1083 (11th Cir. 1996)] (observing that a "'plaintiff
> must, by either direct or circumstantial evidence, demonstrate by a
> preponderance of the evidence that the employer had a discriminatory intent'"
> to prove a disparate treatment claim) (quoting *Batey v. Stone*, 24 F.3d 1330,
> 1334 (11th Cir.1994)).  "Direct evidence is evidence that establishes the

---

[71]*Id.*, ex. B (affidavit of John Porterfield), attachment C, at unnumbered page 19.

existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (citing *Carter v. City of Miami*, 870 F.2d 578, 580-81 (11th Cir.1989)).  Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar *McDonnell Douglas* paradigm for circumstantial evidence claims.  To establish a prima facie case of disparate treatment under this rubric, a plaintiff "must show:  (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999).  Once these elements are established, a defendant has the burden of producing "legitimate, non-discriminatory reasons for its employment action." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir.1997) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).  If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *See Holifield*, 115 F.3d at 1565.

*E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000) (footnote omitted).

Plaintiff contends that he has direct evidence to support his claim that he was not promoted to the position of Director of Advancement Services because of his gender. Specifically, plaintiff contends that statements by Wood to the effect that the University would hire a woman as Director of Advancement Services constitute direct evidence of discrimination. Defendants concede, for purposes of summary judgment only, that there is a genuine issue of fact with respect to the content of Wood's statements. Defendants dispute, however, that Wood was a decisionmaker in the contested employment action, instead asserting that Dr. Morgan made the final decision to hire Patricia Bingham.

Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g., Bass*

*v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (the term "direct evidence," when used in the context of Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption"); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (same); *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same); *Black's Law Dictionary* 577 (7th ed. 1999) (defining direct evidence as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption").

In the context of employment discrimination cases, direct evidence of an employer's intent to discriminate on the basis of some prohibited characteristic is more specifically defined as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter*, 132 F.3d at 641 (in turn quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)).

As such, "direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (per curiam).

Due to the "powerful" nature of direct evidence, the Eleventh Circuit "has marked severe limits for the kind of language [that may] be treated as direct evidence of discrimination." *Id.* (citing *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 962 (11th Cir. 1997); *Burrell*, 125 F.3d at 1393-94 & n.7; *Earley*, 907 F.2d at 1082).

> To give great weight — for example, to say a few isolated words "make all the difference" — to language that is, at best, only circumstantial evidence blurs the important distinction between circumstantial evidence and direct evidence for prima facie cases. Blurring this distinction only adds hurtful uncertainty to the law.
>
> Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case. *See Smith v. Horner*, 839 F.2d 1530, 1536-37 (11th Cir. 1988); *see also E.E.O.C. v. Our Lady of the Resurrection Medical Ctr.*, 77 F.3d 145, 149 (7th Cir. 1996); *Woody v. St. Clair Comm'n*, 885 F.2d 1557, 1560 (11th Cir. 1989).

*Jones*, 151 F.3d at 1323 n.11.

Eleventh Circuit precedent clearly establishes that only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor, will be deemed to constitute direct evidence of discrimination. *See, e.g., Damon*, 196 F.3d at 1358-59; *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999); *Earley*, 907 F.2d at 1081-82; *Carter*, 870 F.2d at 582. "If an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Schoenfeld*,

168 F.3d at 1266 (citing *Burrell*, 125 F.3d at 1393). "An example of direct evidence would be a management memorandum saying, 'Fire Earley — he is too old.'" *Damon*, 196 F.3d at 1359 (quoting *Earley*, 907 F.2d at 1082).[72]

Two additional points must be emphasized. First, "stray remarks in the workplace . . . cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S. Ct. 1775, 1804-05, 104 L. Ed. 2d 268 (1989) (O'Connor, J., concurring).

Second, "statements made by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself," do not constitute direct evidence of discriminatory intent. *Id.*; *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (same).

In summary, "[t]o amount to direct evidence, a statement must:  (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

Charles Wood is alleged to have said during a staff meeting that a female would be hired as Director of Advancement Services.  Plaintiff further alleges that, when he advised

---

[72] *See also Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987):

One example of direct evidence would be a scrap of paper saying, "Fire Rollins —— she is too old." *See Williams* [*v. General Motors Corp.*], 656 F.2d [120,] at 130 [(5th Cir. 1981)]. This court found that there was direct evidence of discrimination when an INS reviewing committee set aside a female applicant's file without reviewing it because the two men knew the director would not consider hiring a woman investigator. *Lewis v. Smith*, 731 F.2d 1535 (11th Cir. 1984). In these instances, the fact that the evidence exists, by itself, proves the discrimination. The evidence at issue here, on the other hand, suggests discrimination. The trier of fact must infer discrimination based on the evidence. By definition, then, it is circumstantial evidence.

23

Wood of his intention to apply for the position, Wood was "taken aback" by the news, and reminded plaintiff that a female would be hired for the position. In response to this assertion, defendants contend that "[a]ssuming Wood made such [ ] statement[s], which he denies, [plaintiff] still is not entitled to take this case to a jury because Wood was not the ultimate decisionmaker in the process to fill the position of Director of Advancement Services."[73] This point is crucial: if Wood were not the decisionmaker, the statements attributed to him would constitute only circumstantial evidence of discrimination, subject to analysis under the burden-shifting framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Upon review of the evidence, the court concludes that defendants' argument must fail. At the outset, the court observes that Wood need not have been the *ultimate* decisionmaker with respect to the decision to hire Bingham, instead of plaintiff, for his alleged statements to constitute direct evidence of discrimination. Rather, if Wood was "involved in the challenged decision," any statements of discriminatory intent made by him could be considered direct evidence. "For statements of discriminatory intent to constitute direct evidence of discrimination, *they must be made by a person involved in the challenged decision*." *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1453-54 (11th Cir. 1996) (emphasis supplied); *see also Bass*, 256 F.3d at 1105 ("Only statements by the person involved in the decisionmaking process, here the interview panel members, could

---

[73]Doc. no. 28 (Memorandum Brief in Support of Defendants' Motion for Summary Judgment), at 18.

constitute direct evidence of discrimination."); *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998) ("A statement by a person who played no part in the adverse personnel decision is not direct evidence of discrimination.") (citing *Mauter v. The Hardy Corp.*, 825 F.2d 1554, 1557 (11th Cir. 1987)); *Eiland v. Trinity Hospital*, 150 F.3d 747, 751-52 (7th Cir. 1998) (rejecting plaintiff's attempts at imputing racial animus of co-worker to decisionmaker).

Here, the evidence of Wood's role in the decision to hire Bingham is contradictory. Perhaps most compelling, however, is the fact that defendants described the hiring process in their position statement to the EEOC in the following manner:

> UAH policy encourages employees to pursue promotion opportunities within the University. Therefore, an announcement of the Director position was posted in the University's Staff Employment Office on January 13, 2000. Because this position is an important, higher profile position, UAH decided to conduct a nationwide search to obtain a larger pool of qualified applicants. Therefore, additional advertisements of the opening were placed on the websites of a professional organization for advancement personnel and of an organization that lists job openings in higher education. Charles Wood, the University's Director of Development, selected a committee of UAH employees who would report to or work with the person selected as Director to review applications and to conduct interviews of selected applicants. Complainant was a member of this committee.
>
> Although the committee played an important role in the selection process, *the final hiring decision for the Director position remained in the discretion of Wood*.[74]

Wood nevertheless maintained during his deposition that he was merely a "part" of the hiring process. He stated that a candidate had to be approved by the Vice President for

---

[74]Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. L, tab 33, at 2 (emphasis supplied).

University Advancement and by Human Resources before he or she would be hired.[75] Carolyn Horan, UAH's Director for Employment Compliance and Compensation, said: "[Wood's] decision was the final one.  I saw the committee as more of a screening committee."[76]  Dr. Morgan stated that Wood would recommend to him that a particular applicant be hired, and that he (Morgan), in turn, would make a recommendation to the Human Resources Department, "because they have the ultimate decision in the hiring of what are called staff at the University, faculty."[77]  During Dr. Morgan's deposition, however, the following exchange occurred:

> Q.    Was it your idea to hire [Bingham] or did you just approve the decision or the suggestion?
>
> A.    Well, Charles would have evaluated it and made a recommendation to me.  I would have concurred or not concurred, and then we would have sent it over to Human Resources.
>
> Q.    *Did Mr. Wood, in fact, suggest to you that Ms. Bingham be hired for the position?*
>
> A.    *He had to or we wouldn't have done it.*[78]

April Harris said only that she "assumed" that *Dr. Morgan* had the "final say" as to who would be hired as Director of Advancement Services, "[b]ecause the decision was made, and he is the boss."[79]

---

[75]*Id.*, ex. J (deposition of Charles Wood), at 24.

[76]*Id.*, ex. C (deposition of Carolyn Horan), at 28.

[77]*Id.*, ex. D (deposition of John Derald Morgan, Ph. D.), at 30.

[78]*Id.* at 108 (emphasis supplied).

[79]*Id.*, ex. J (deposition of April Harris), at 16.

For these reasons, the court concludes that defendants have failed to demonstrate that Wood was not involved in the decision to hire Patricia Bingham.

Moreover, even if Dr. Morgan, rather than Wood, was responsible for the employment decision, plaintiff has adduced sufficient evidence that the selection process was "tainted" by Wood's remarks. In *Schoenfeld v. Babbit*, 168 F.3d 1257 (11th Cir. 1999), the Eleventh Circuit addressed Title VII race and gender claims brought by a white male plaintiff who had been rejected for a fish and wildlife biologist position by the United States Department of Interior. The hiring procedure had several levels and involved a number of officials within the Department.[80] Speaking of the next-to-last selection official — "the assistant regional director for Human Resources for the southeast region of the United States Fish and Wildlife Service,"[81] whose approval was necessary to forward an applicant's name to the final decision making official — the court said:

> Although Boyd was not the final decision maker, he was an integral part of the multi-level hiring process that had been established by the Department of Interior's Fish and Wildlife Service. It was necessary for him to indicate his approval or disapproval of a candidate and forward the application package before it would reach the final decision maker.  As a result, the

---

[80] *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1260-61 (11th Cir. 1999). In summary, however,

> [t]he initial-selecting official . . . sends his recommendation and the requisite forms to the assistant regional director of his program. If that person agrees with the selection, he or she forwards it to the Office of Human Resources, where it is reviewed and screened for compliance with Equal Employment Opportunity (EEO) guidelines. After Human Resources reviews the recommended candidate package and indicates approval or disapproval, the package of materials is sent to the regional director in Atlanta, Georgia, for a final decision. if the regional director approves the selection, then the information is sent back to personnel. Personnel then calls the selected person and offers him or her the job.

*Id.* at 1261.

[81] *Id.* at 1262.

27

> [circumstantial] evidence regarding Boyd's conduct suggests that a
> discriminatory animus was at work that tainted the entire hiring process.

*Id.* at 1268.

The Second Circuit case of *Barbano v. Madison County*, 922 F.2d 139 (2d Cir. 1990),

also is instructive.  In *Barbano,* the plaintiff brought suit against a county board, alleging

discriminatory failure to hire.  In order to fill the vacant position that plaintiff was seeking,

the board appointed a committee to interview the potential candidates and then submit its

recommendation to the board.  During the interview of the plaintiff, one member of the

committee asked questions that were blatantly based on sexual stereotypes.  After the

committee recommended a male, and the board approved the recommendation, plaintiff

brought suit.  The Second Circuit determined that there was a basis for imputing the

discriminatory actions of one committee member to the board, and based their decision on

several findings.  First, the court found that other members of the committee had acquiesced,

and sat silently while the plaintiff was asked a series of discriminatory interview questions.

*Id.* at 143.   The court determined that "[t]his knowing and informed toleration of

discriminatory statements by those participating in the interview constitutes evidence of

discrimination by all those present."  *Id.*  More importantly, however, the court found that

the entire board was aware of the objectionable interview process.  When the board met to

adopt a resolution to fill the vacant position, the plaintiff, who was present at the meeting,

voiced her objections to her discriminatory interview experience.  The court found that "[a]t

this point, the entire Board membership was alerted to the possibility that the Committee had

discriminated against Barbano during her interview." *Id.* at 144. Furthermore, after becoming aware of the plaintiff's allegations, the board did not investigate Barbano's objections, and simply relied upon, and approved, the committee's recommendation, despite its knowledge of possible impropriety. *Id.*

Here, plaintiff has adduced evidence that Dr. Morgan was aware of, and arguably condoned and ratified Wood's statements to the effect that a female would be hired to fill the position of Director of Advancement Services. In particular, April Harris stated during deposition, when asked whether Dr. Morgan and Wood indicated their intention to hire a woman: "The truth is that in a preliminary discussion, at which Mr. Porterfield was present, we discussed the overall staffing needs in our division; and the position had been filled by a woman, and that we needed more women on our staff, particularly in management positions if possible."[82] Moreover, David Trueb, Director of Annual Giving, said that, during a meeting held in Dr. Morgan's office, "it was mentioned that [Dr. Morgan and Wood] felt it would be appropriate to hire a female [as Director of Advancement Services] at the time." Trueb further stated that "the comment was made by Charles Wood , if I recall correctly, and confirmed by Dr. Morgan as being acceptable . . . ."[83]

Accordingly, the court concludes that summary judgment is due to be denied with respect to plaintiff's disparate treatment claim.

---

[82]Ex. J (deposition of April Harris), at 17. Ms. Harris further stated that "the first person who was offered the job was a black man," and conceded that there were no African-American employees among the Department's "professional" staff. As noted *supra* note 26, there is some question as to whether Waymon Ward or Marilyn Hargrave was the first choice for the position.

[83]Ex. H (deposition of David Trueb), at 12.

## B.   Retaliation

"Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*,

212 F.3d 571, 586 (11th Cir. 2000).  Section 704(a) of Title VII of the Civil Rights Act of

1964 provides protection for employees who oppose or participate in activities to correct an

employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. § 2000e-3(a).  Congress thus recognized two bases for a claim of retaliation:  one

for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.'  . . .  And, under the participation clause, an employer may not retaliate against an employee because the employee 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'  . . ."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171,

1174 (11th Cir. 2000).  Here, plaintiff proceeds under the participation clause.

Generally speaking, a prima facie case of retaliation has three elements.  A plaintiff

must prove that:  (1) he engaged in statutorily protected activity; (2) he suffered an adverse

employment action; and (3) there was a causal linkage between the protected activity and the

adverse employment action.  *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d

1095, 1117 (11th Cir. 2001) (Title VII claim); *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000) (FMLA claim); *Gupta*, 212 F.3d at 587 (Title VII claim); *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (ADA claim); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998) (Title VII claim); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997) (Title VII claim); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (Title VII claim); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (Title VII claim).

There is no question that plaintiff engaged in protected activity under the participation clause when filing a charge of discrimination with the EEOC. Accordingly, plaintiff has established the first element of his retaliation claim.

As for the second element, plaintiff identifies several incidents that he contends were adverse employment actions, and ultimately claims that he resigned his position because of those events, and that his resignation should be considered a "constructive discharge."

"The threshold for establishing constructive discharge . . . is quite high." *Hipp v. Liberty National Life Insurance Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001). Such claims are evaluated from the view of a reasonable person in plaintiff's circumstances — plaintiff's subjective feelings are not considered. *Doe v. Dekalb County School District*, 145 F.3d 1441, 1450 (11th Cir. 1998). "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in [his]

31

position would have been compelled to resign.'" *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (quoting *Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)).  As the Eleventh Circuit observed in *Hipp*:

> The standard for proving constructive discharge is higher than the standard for proving a hostile work environment.  *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."), *aff'd*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *see also Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316-18 (11th Cir. 1989) (affirming district court's conclusion that Title VII plaintiffs were subjected to hostile work environment, but were not constructively discharged); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905-06 (11th Cir. 1988) (same).

*Hipp*, 252 F.3d at 1231.

In support of his claim of constructive discharge, plaintiff asserts that:  he was asked to assume an unusually heavy workload; unreasonably short deadlines were established for completion of his assignments; on a few occasions he was required to work on Saturdays, which was not his regularly scheduled work day; and Bingham threatened to terminate his employment. While plaintiff genuinely may have been unhappy with his working conditions, viewing these events individually, and in totality, in the light most favorable to plaintiff, the court simply cannot conclude that a reasonable jury would find them so severe and pervasive as to cause a reasonable person to resign.  Accordingly, plaintiff has failed to establish that he was constructively discharged, and summary judgment is due to be granted with respect to plaintiff's retaliation claim.

## C.    Section 1983 Claims

Plaintiff asserts claims against Charles Wood and Dr. John Derald Morgan under 42 U.S.C. § 1983 for violation of his Fourteenth Amendment equal protection right to be free from sex discrimination.[84]  Both Wood and Morgan assert that they are entitled to qualified immunity.

The doctrine of qualified immunity protects state governmental officials who are sued for money damages in their personal, or individual, capacities, but only so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982); *see also, e.g.*, *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001) (same).

> The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001).  Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted).
>
> In order to receive qualified immunity, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir.

---

[84]In his brief in opposition to the motion for summary judgment, plaintiff concedes, and the court agrees, that a retaliation claim may not be maintained under § 1983, as such a claim does not implicate the Equal Protection Clause. *See Watkins v. Bowden*, 105 F.3d 1344, 1354-55 (11th Cir. 1997).

1988)). If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity . . . .

*Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002); *see also, e.g., Chesser v. Sparks*, 248 F.3d 1117, 1121-22 (11th Cir. 2001); *Lassiter v. Alabama A & M University Board of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc). When a defendant establishes that he was acting within his discretionary authority in performing a contested act, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194; *see also, e.g., Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("Once an officer or official has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff.") (citing *Suissa v. Fulton County*, 74 F.3d 266, 269 (11th Cir. 1996); *Barnette v. Folmar*, 64 F.3d 598, 600 (11th Cir. 1995); *Lassiter*, 28 F.3d at 1150 n. 3).

Essentially, the doctrine provides that "[g]overnment officials performing discretionary functions are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hartley v. Parnell*, 193 F.3d 1263, 1268 (11th Cir. 1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).[85] Stated somewhat differently, qualified immunity "protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or

---

[85] *See also, e.g., Jackson v. Sauls*, 206 F.3d 1156, 1164 (11th Cir. 2000) ("Qualified immunity shields a § 1983 defendant from liability for harms arising from discretionary acts, as long as the discretionary acts do not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known.").

34

constitutional rights of which a reasonable person would have known." *Lassiter v. Alabama A & M University*, 28 F.3d 1146 (11th Cir. 1994) (en banc) (citations and internal quotation marks omitted).[86]

> The general rule of qualified immunity is intended to provide government officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages." . . . Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law.

*Anderson v. Creighton*, 483 U.S. 635, 646, 107 S. Ct. 3034, 3042, 97 L. Ed. 2d 523 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S. Ct. 3012, 3019, 82 L. Ed. 2d 139 (1984)).

In analyzing a qualified immunity defense, district courts are to consider only the "clearly established law and the information possessed by the official at the time the conduct occurred." *Hope v. Pelzer*, 240 F.3d 975, 981 (11th Cir. 2001) (citation and internal quotation marks omitted). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter*, 28 F.3d at 1150.

> What this means in practice is that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action,

---

[86] The Eleventh Circuit recently reiterated that "[t]he basic law of this circuit for qualified immunity is set out in *Lassister v. Alabama A & M University*, 28 F.3d 1146 (11th Cir. 1994) (*en banc*)." *Marsh v. Butler County*, 268 F.3d 1014, 1021 n. 1 (11th Cir. 2001) (*en banc*) (citing *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 823 (11th Cir. 1997) (*en banc*) (holding that "[t]he principles of qualified immunity set out in *Lassiter v. Alabama A & M Univ.*, continue to be the guiding directives for deciding cases involving the question of a state actor's entitlement to qualified immunity in this circuit.") (internal citation omitted)).

assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken."

*Wilson v. Layne*, 526 U.S. 603, 614, 119 S. Ct. 1692, 1699, 143 L. Ed. 2d 818 (1999)

(quoting *Anderson*, 483 U.S. at 639, 107 S. Ct. at 3038 (in turn quoting *Harlow*, 457 U.S. at

819, 102 S. Ct. at 2739)).

> When the defense of qualified immunity is available to a particular defendant in a section 1983 context, a plaintiff must establish a lack of objective good faith to avoid *a directed verdict* in favor of the defendant. *See Barnett v. Housing Auth.*, 707 F.2d 1571, 1582 (11th Cir.1983); *cf. Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982) (*summary judgment*); *Schopler v. Bliss*, 903 F.2d 1373, 1380 (11th Cir.1990) (*motion to dismiss*).

*Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (emphasis added).

Qualified immunity "is the usual rule; only in exceptional cases will government

actors have no shield against claims made against them in their individual capacities."

*Lassiter*, 28 F.3d at 1149 (citations and footnote omitted).

> Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit. *See Malley v. Briggs*, 475 U.S. 335, 341-43, 106 S. Ct. 1092, 1096-97, 89 L. Ed. 2d 271 (1986). Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.

*Lassiter*, 28 F.3d at 1149; *see also Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1171

n.9 (11th Cir. 2001) ("[O]fficials sued in their individual capacities under § 1983 are

generally entitled to qualified immunity unless a factually similar and controlling case has

clearly established that the conduct is impermissible.").

>Because qualified immunity is the "usual rule" for government actors sued in their individual capacities, it will shield them unless case law establishes a bright line in "a concrete and factually defined context" that makes a violation of federal law obvious. [*Lassiter*, 28 F.3d at 1149.] "Thus, a police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir.2000).

*Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001).

Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent and those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991) (internal quotations and citations omitted); *see also, e.g., Busby v. City of Orlando*, 931 F.2d 764, 773 (11th Cir. 1991) ("This standard shields all government officials except those who either are plainly incompetent or who knowingly violate the law.") (citations omitted).

The Eleventh Circuit recognized in *Hudgins v. City of Ashburn* that the Supreme Court attempted in *Harlow v. Fitzgerald* "to eliminate [the] difficulties encountered by district courts in determining subjective good faith of defendant government officials" by formulating an objective test, under which "the conduct of defendant public officials is measured against clearly established law, consisting of statutory or constitutional rights of which a reasonable person should have known." *Hudgins*, 890 F.2d 396, 404 (11th Cir. 1990) (citations and internal quotation marks omitted).

>The Court has clarified qualified immunity by holding "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate *clearly*

37

*established statutory or constitutional rights* of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738 (emphasis added). The effect of this objective test is broad; qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

*Hudgins*, 890 F.2d at 402-03.

In view of the foregoing, the court must examine the alleged conduct of Wood and Dr.

Morgan in the context of the applicable substantive legal principles:

In order to establish a violation of the Equal Protection Clause, [a plaintiff] must prove discriminatory motive or purpose. *Whiting v. Jackson State University*, 616 F.2d 116, 122 (5th Cir. 1980). The court in *Whiting* held that "such intent should be inferred in the same manner as [the Supreme Court] said it is inferred under [42 U.S.C. § 2000e-5]." *Whiting*, 616 F.2d at 121. "When section 1983 is used as a parallel remedy for violation of section 703 of Title VII [42 U.S.C. § 2000e-2], the elements of the two causes of action are the same." *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982) (citing *Whiting*, 616 F.2d at 123).

*Cross v. State of Alabama*, 49 F.3d 1490, 1507-08 (11th Cir. 1995).

The issue of whether Wood and Dr. Morgan were acting pursuant to their discretionary authority is not disputed: they were. Moreover, there is no question that plaintiff has a clearly established equal protection right to be free of sex discrimination in employment. *See Nicholson v. Georgia Department of Human Resources*, 918 F.2d 145, 148 (11th Cir. 1990) (holding, in the context of assessing governmental officials' defense of qualified immunity to plaintiff's claim that transfer and treatment was unconstitutional sex discrimination, that "[f]or a considerable time now, the law has been quite clear that such government action that discriminates on the basis of sex is unconstitutional, unless that

conduct is, at minimum, substantially related to the furtherance of an important government interest").

As discussed above, the court has determined that there is a genuine issue of material fact as to whether Wood and Dr. Morgan acted with discriminatory intent with respect to the decision to hire Bingham as Director of Advancement Services. Even so, they may be entitled to qualified immunity if their conduct was objectively reasonable — *i.e.*, if "the only conclusion a rational jury could reach is that reasonable offic[ials] would disagree about the legality of the defendant['s] conduct under the circumstances." *Brown v. Cochran*, 171 F.3d 1329, 1332 (11th Cir. 1999) (internal quotation marks omitted and alterations in original).

Another district court within the Eleventh Circuit, addressing claims similar to those presented here, framed the inquiry as follows:

> [A] defendant sued for discrimination under Section 1983 may prevail, even if the plaintiff establishes that the defendant acted with a discriminatory motive, if the defendant establishes that he also acted from a non-discriminatory motive and that the non-discriminatory motive alone would have prompted the same adverse action even had the discriminatory motive not existed. The defense is often referred to as the "*Mt. Healthy*" defense, after the seminal case establishing the principle. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). "The *Mt. Healthy* doctrine is part of the law and, when the concept is presented by a defendant's argument, must not be overlooked in the qualified immunity analysis." *Foy v. Holston*, 94 F.3d 1528, 1534 (11th Cir. 1996). The defendants, invoking this principle, argue that "there is ample evidence that the defendant would have reached the same decisions anyway."
>
> Application of the *Mt. Healthy* doctrine to qualified immunity analysis requires the defendant to identify a legally adequate, non-discriminatory motive for the challenged action, to produce evidence that the defendant had sufficient reason to believe that the facts underlying the non-discriminatory

motive actually existed, and to produce evidence that the defendant relied, at least in part, on the articulated reason.  Because all issues of fact must be resolved favorably to plaintiff, the defendant must rely on uncontroverted evidence.

On the other hand, even though to prevail on the merits the defendant official must establish that his reliance on the non-discriminatory motive would have resulted in the same adverse action even absent a discriminatory motive, to prevail on the basis of qualified immunity the defendant official need not do so, since the very existence of a mixed motive generally requires the conclusion that "reasonable officials would disagree about the legality of the defendant['s] conduct under the circumstances," including the circumstance of the non-discriminatory motive.  If the defendant's burden is satisfied, the plaintiff may avoid summary judgment on the grounds of qualified immunity only if, "as a legal matter, it is plain under the specific facts and circumstances of the case that the defendant's conduct — despite his having adequate lawful reasons to support the act — was the result of his unlawful motive." *Foy v. Holston*, 94 F.3d at 1535.  This will be the rare case because, when qualified immunity depends on a fact-specific balancing, the "bright lines" required to defeat immunity are "almost always" lacking in the pre-existing case law. *Id.* at 1535 n.8.

*Morris v. Wallace Community College – Selma*, 125 F. Supp. 2d 1315, 1339-40 (S.D. Ala. 2001) (footnotes and some citations omitted).

Here, Wood and Dr. Morgan assert that the decision to hire Patricia Bingham, rather than plaintiff, as Director of Advancement Services was based on Bingham's "significant managerial experience."[87] Defendants also assert that the decision was based upon plaintiff's history as a "problem employee" and his unsatisfactory performance during the interview.[88]

The position description for Director of Advancement Services lists as a required qualification "demonstrated management and administrative skills, with solid judgment and

---

[87]Doc. no. 28 (Memorandum Brief in Support of Defendants' Motion for Summary Judgment), at 5.
[88]*Id.* at 6-7.

sensitivity to others" and "demonstrated ability to motivate a team."[89]  Bingham's resume

reflects that she had almost ten years of management experience at the time she was

interviewed — while employed by the Bi-State Development Agency, she held the title of

Bus Transportation Manager from June of 1992 until August of 1996, and Assistant Manager

Transportation Systems Development from August of 1996 until August of 1997.[90]  In

contrast, the record establishes that plaintiff had minimal supervisory experience.[91]

UAH's response submitted to the EEOC stated: "Bingham had significant experience

as a manager for the bus transportation system in St. Louis, Missouri.  In that position she

directly supervised 40 to 65 bus drivers and achieved substantial improvements in

performance and in reduction of absenteeism during her tenure."[92]  Defendants have

consistently maintained that management experience was an important qualification, and that

Bingham was selected because she had such experience.  *Compare Stanley v. City of Dalton*,

219 F.3d 1280, 1296-97 (11th Cir. 2000) (on four occasions, defendant official identified the

same reason for terminating the plaintiff) *with Morris*, 125 F. Supp. 2d at 1340 (College

president gave "fluctuating explanations of his reasons for failing to name the plaintiff as

athletic director").

Because, for purposes of qualified immunity, Wood and Dr. Morgan need only show

---

[89]*Id.*, ex. L, tab 1.

[90]Doc. no. 29  (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. L, tab 4.

[91]Plaintiff had experience supervising two student interns. Doc. no. 29 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), ex. A (deposition of John Porterfield), at 89.

[92]*Id.*, ex. L, tab 33, at 3.

the existence of a non-discriminatory motive, the court is satisfied that they have met their

burden.   Accordingly, Wood and Dr. Morgan are entitled to qualified immunity, and

defendants' motion for summary judgment is due to be granted as to plaintiff's claims based

upon 42 U.S.C. § 1983.

## IV. CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is granted

with respect to plaintiff's Title VII retaliation claim and his claims based upon 42 U.S.C. §

1983, but is denied with respect to his Title VII disparate treatment claim.  A separate order

consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this __30th__ day of July, 2003.

United States District Judge